UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DUSTYN JAMES TAYLOR,<br><br>Defendant. | 4:16-CR-40068-KES<br><br><br>REPORT AND RECOMMENDATION<br>MOTION TO SUPPRESS<br>DOCKET NO. 40 |

**INTRODUCTION**

Defendant Dustyn James Taylor is before the court on an indictment charging him with being a felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1).  See Docket No. 1.  Mr. Taylor now moves the court for an order suppressing the evidence which was found during a parole search on February 5, 2016, and which evidence forms the basis of the indictment.  See Docket No. 40.  The government resists the motion.  See Docket No. 47.

**FACTS**

On June 8, 2015, Mr. Taylor was released to parole from a South Dakota state conviction.  During his initial parole meeting with his parole officer (Heather Buiter) Ms. Buiter explained the terms and conditions of Mr. Taylor's parole.  See Exhibit A.  Mr. Taylor's mother was present during this initial meeting.  During this meeting, Ms. Buiter explained the conditions of Mr. Taylor's parole.  Mr. Taylor executed a Standard South Dakota Parole

Supervision Agreement (hereinafter "agreement").  See Exhibit A.  The agreement contained several conditions with which Mr. Taylor agreed to comply in order to remain on parole.  Among those conditions included: that Mr. Taylor would obey all local, state and federal laws (Id., SA 1); that Mr. Taylor would not possess, purchase, or use marijuana, narcotics, controlled substances or drug paraphernalia (Id., SA 2); that Mr. Taylor would not own, purchase, or possess dangerous weapons (Id., SA 4); that Mr. Taylor would avoid companions with criminal influences (Id., SA 7); that Mr. Taylor would comply with all instructions of his parole agent in matters affecting his supervision and cooperate fully and truthfully in answering his parole agent's inquiries (Id., SA 10); that Mr. Taylor would not purchase or consume alcohol and would not enter establishments whose primary business was the sale of intoxicating beverages (Id., SA 13A & B); and that Mr.  Taylor would refrain from assaultive, abusive, or violent behavior and threats of violence (Id., SA 14).  Finally, the agreement allowed Mr. Taylor's parole agent to visit his home at any time (Id., SA 9) and provided that Mr. Taylor would submit his person, property, and place of residence to search and seizure at any time, with or without a search warrant, whenever a parole agent or law enforcement officer determined there was "reasonable suspicion." (Id., SA 5).

During this initial meeting with Ms. Buiter, Mr. Taylor expressed that while in the past he had been an "aggressive" person, he had outgrown such behavior.  Mr. Taylor was paroled to live with his parents at a home on Menlo

Avenue in Sioux Falls, South Dakota.  Based on his level of need, Ms. Buiter met with Mr. Taylor once per month during his supervision.

On June 28, 2015, a Brandon, South Dakota, police officer notified Ms. Buiter that Mr. Taylor had been in a bar fight.  As a result of the bar fight, Mr. Taylor received a broken nose.  Though no criminal charges were filed against him, Mr. Taylor's mere presence in a bar was a violation of the terms of his supervision agreement.  See Exhibit A, SA 13B.  As punishment for this incident, Ms. Buiter placed Mr. Taylor in the Community Transition Program (CTP).  The CTP is a structured program in which parolees are free to attend work during the day but must check into a residential correctional facility at night.  See  https://doc.sd.gov/documents/about/policies/Parole%20Services-Community%20Transition%20Program.pdf (last checked December 29, 2016). Mr. Taylor was in the CTP program for approximately one month.

On July 31, 2015, Ms. Buiter informed Mr. Taylor he would be allowed to move back into the home on Menlo Avenue on the condition that his parents did not reside there.  Ms. Buiter did not want Mr. Taylor to reside with his parents because his parents had been present in the bar in Brandon with Mr. Taylor when he had gotten into the fight.  See Exhibit A, SA 10, 13B. Mr. Taylor agreed to this condition, and informed Ms. Buiter his parents would move out of the Menlo Avenue home which he planned to rent.  Mr. Taylor represented to Ms. Buiter his parents would move out before his release from CTP and only his girlfriend, Talissa Toft, would be living there with him. Ms. Buiter approved this living arrangement and allowed Mr. Taylor to move

3

back to the Menlo Avenue address.  This condition was verbally agreed to by Mr. Taylor and is noted in Ms. Buiter's case notes regarding Mr. Taylor's supervision.

On January 30, 2016, Ms. Buiter received an email from Sioux Falls Police Department (SFPD) Detective Skidmore.  The email relayed that Detective Skidmore had received information from a confidential informant regarding Mr. Taylor.  The confidential informant told Detective Skidmore the following information about Mr. Taylor:  (1) Mr. Taylor had multiple guns in the Menlo Avenue home; (2) the type of vehicle Mr. Taylor drove and that Mr. Taylor "possibly" had a gun in his vehicle; (3) Mr. Taylor was selling drugs out of his  Menlo Avenue home; and (4) the person who had reported this information to Detective Skidmore did not want to make a police report because he/she had been in a dispute with Mr. Taylor and was afraid of retaliation.[1]

After receipt of this email from Detective Skidmore, Ms. Buiter contacted the Sioux Falls Police Department narcotics unit.  The narcotics unit informed Ms. Buiter it had received a Crime Stoppers tip regarding the Menlo Avenue home and that it had an open file regarding Mr. Taylor.  Ms. Buiter did not receive any further information about the content of the Crime Stoppers tip and did not rely on the Crime Stoppers information in deciding to search

[1] At the conclusion of the hearing, the court ordered Ms. Buiter to produce this email to the government to file with the court for an *in camera* review. Ms. Buiter complied, and a non-redacted version of the email has been filed under seal.  A redacted form of the email has also been filed by the court, along with an Order for the government to produce it to Mr. Taylor by January 5, 2017.  See Docket 55.

Mr. Taylor's residence.  Ms. Buiter testified the Crime Stoppers tip did not contribute to her reasonable suspicion to search because she did not know its contents.[2]  After she received the email from the Detective Skidmore, Ms. Buiter decided to conduct a parole search of Mr. Taylor's home.

Ms. Buiter made the decision to search based upon a culmination of circumstances.  Mr. Taylor previously articulated a propensity for violence, but claimed he had outgrown it.  Based on the occurrence of the bar fight, she believed he had been insincere about his statement that he had outgrown his propensity for violence.[3]  Detective Skidmore's comment regarding the informant's fear of retaliation added to her conviction that Mr. Taylor had lied to her about leaving his propensity for aggression behind.  In her view, that Mr. Taylor had lied to her about this issue was a violation of the parole agreement (SA 10, 14).  Finally, the information she received from Detective Skidmore's email led her to believe Mr. Taylor had violated the terms of his parole agreement regarding possessing weapons and drugs (SA 2 and SA 4).  The information regarding Mr. Taylor possessing guns led Ms. Buiter to be increasingly concerned about Mr. Taylor's violent tendencies.  Ms. Buiter knew nothing about the informant referenced in Detective Skidmore's email, and she

---

[2] The discovery provided to Mr. Taylor in his state criminal case also included an earlier Crime Stoppers tip regarding the Menlo Ave. home which was made in February, 2015.  See Docket 41-3.

[3] Ms. Buiter explained this on direct examination when she indicated she did not violate Mr. Taylor's parole immediately after the bar fight because pursuant to "SB 70" felons in South Dakota are now being given more chances before they are simply locked away in the penitentiary.  SB 70 was passed in 2013 and was commonly referred to as the Public Safety Improvement Act. http://psia.sd.gov/general.aspx (Last Checked December 29, 2016).

could not personally testify about his/her reliability.  Ms. Buiter stated she trusted Detective Skidmore's tip.

Though she received Detective Skidmore's email on January 30, 2016, Ms. Buiter did not conduct the parole search immediately because she needed some time to prepare to make sure the search could be conducted safely.  On February 5, 2016, Mr. Taylor arrived at Ms. Buiter's office for his regular (though re-scheduled) parole meeting.  Ms. Buiter detained Mr. Taylor for investigative and safety purposes.  Ms. Buiter contacted the Sioux Falls Police Department for assistance in conducting the parole search. Mr. Taylor was detained at the Jameson Annex of the South Dakota Penitentiary while Ms. Buiter, with the assistance of two SFPD officers, conducted the search of his home.

Upon arrival at the Menlo Avenue home, Ms. Buiter was met at the door by Mr. Taylor's step-father.  Mr. Taylor's mother was also present at the Menlo Avenue home.  Mr. Taylor's mother explained to Ms. Buiter that though Mr. Taylor rented the home, Mr. Taylor's parents also lived there, with Mr. Taylor and Ms. Toft occupying the basement.

Upon arrival at the Menlo  Ave. home, and before she began the search, Ms. Buiter determined Mr. Taylor had further violated his parole agreement by failing to follow her instructions regarding his living arrangements. Specifically, Mr. Taylor had lied to Ms. Buiter by indicating his parents had moved out of the Menlo Avenue home before he had been released from CTP

and had moved back in.  This deception was in direct violation of parole agreement SA 10.

Ms. Buiter decided to search the basement area where Mr. Taylor lived with Ms. Toft.  She saw a UA[4] kit, which raised her suspicion further about Mr. Taylor's use or possession of drugs.  In the area occupied by Mr. Taylor, the following items were found: (1) four firearms; (2) two baggies of methamphetamine; (3) marijuana; and (4) a marijuana pipe.

Mr. Taylor was originally charged with new felony drug and firearms offenses in South Dakota state court. He was transported to the Minnehaha County Jail.  When Ms. Buiter decided to violate Mr. Taylor's parole he was transferred back to the Jameson Annex of the South Dakota State Penitentiary. Mr. Taylor was indicted on the federal charges herein on June 7, 2016.  See Docket No. 1.  The indictment charges Mr. Taylor with possession of three firearms on February 5, 2016.  Shortly after the federal indictment issued, the state dismissed Mr. Taylor's state charges.

Mr. Taylor moved to compel the government to disclose the January 30, 2016, email sent from the Sioux Falls Police Detective to Ms. Buiter and the complete, un-redacted Crime Stopper report referenced by Ms. Buiter in a July 7, 2016, summary letter (Exhibit B) along with the earlier (2015) Crime Stoppers report disclosed in discovery to Mr. Taylor in his underlying state court case, State v. Taylor, CRI16-000909.  See Docket No. 27 at pp. 2-3.

---

[4] Urine analysis.  http://www.urbandictionary.com/define.php?term=UA (last checked December 29, 2016).

In this federal action, the government resisted disclosing the email and the un-redacted Crime Stoppers tip.  As to the email the government explained it had requested the email, but Ms. Buiter did not make the email available to the government.  See Docket No. 34 at p. 2.  As to the Crime Stoppers tip, the document was provided to the government, but the date the tip was received had been redacted from the document.  The government requested an un-redacted form of the document, but it was not made available to the government.  See Docket No. 34 at p. 2.

This court ordered the government to request a copy of the email from the SFPD and to produce a redacted version of the email if it was possible to do so without revealing the identity of the confidential informant (see Docket Nos. 35 & 36).  The court likewise ordered the government to request an un-redacted version of the Crime Stoppers tip from the SFPD.  Id.  Despite the court's orders, the documents were not produced.  The government explained it had never seen nor possessed the email received by Ms. Buiter from the SFPD Detective.  Ms. Buiter refused to release the email to the government because it would "most certainly" identify the confidential informant.  See Docket 37. Ms. Buiter explained during the evidentiary hearing on Mr. Taylor's motion to suppress that though she did not retain a hard copy of the email in Mr. Taylor's file, she did retain the email on her computer in her email file.

SFPD also refused to provide the government with a copy of the email. See Docket 37.  As explained above, during the course of the evidentiary hearing on Mr. Taylor's motion to suppress this court ordered Ms. Buiter to

8

produce Detective Skidmore's email to the government for an *in camera* review by this court. Ms. Buiter and the government have complied with this court's order. Similarly, the government requested a more complete copy of the Crime Stoppers tip from the SFPD. Specifically, the government explained the SFPD does not maintain the Crime Stoppers database. The database is maintained by a separate entity, Crime Stoppers of the Sioux Empire, who provides the tips to the SFPD. The government contacted Crime Stoppers of the Sioux Empire but was not granted access to the Crime Stoppers tip in an un-redacted form. The government provided Mr. Taylor with another Crime Stoppers tip that was dated nearly a year before the parole search was conducted. This second Crime Stoppers tip, dated February 20, 2015, identifies Mr. Taylor's Menlo Avenue address as a place where drugs are sold but does not identify Mr. Taylor by name. In light of Ms. Buiter's testimony during the evidentiary hearing, this court considers further pursuit of information about either of the Crime Stoppers tips to be unnecessary. This is because Ms. Buiter clearly testified she did not know the content of the Crime Stoppers tips nor did she rely on the Crime Stoppers information to form her opinion that reasonable suspicion existed to search Mr. Taylor's home.

Mr. Taylor now moves to suppress the fruits of the parole search. He asserts that without further information about the email received by his parole officer and the undated Crime Stoppers tip, it is impossible to discern whether there was sufficient reasonable suspicion to conduct the parole search.

## DISCUSSION

### A.    Mr. Taylor's Expectation of Privacy as a Parolee

In <u>Griffin v. Wisconsin</u>, 483 U.S. 868 (1987), the United States Supreme Court held that a probationer's home can be searched without a warrant or a finding of probable cause as is normally required by the Constitution.  <u>Id.</u> at 876.  The Court explained that probationers do not enjoy the liberty to which ordinary citizens are entitled but instead enjoy a form of liberty which is conditional upon restrictions which may be placed upon them by their probation officers.  <u>Id.</u> at 874.

The Court explained the special needs of the probation system justify the curtailed form of liberty which allows for a probation search without probable cause.  <u>Id.</u>  Instead, searches which are conducted based upon mere reasonable suspicion suffice, because the delay in obtaining a warrant would make it too difficult for probation officials to respond to evidence of misconduct and would reduce the deterrent effect that the possibility of expeditious searches would otherwise create.  <u>Id.</u> at 876.

In <u>Griffin</u>, the probation officer's supervisor searched Mr. Griffin's home[5] based upon a tip from a police officer.  <u>Id.</u> at 871.  The tip was merely that

_____

[5] That Mr. Taylor is a parolee instead of a probationer does not alter the analysis, other than to subject him to an even lesser expectation of privacy than Mr. Griffin had as a probationer.

The Eighth Circuit described the various forms of supervision which might subject one to a search based upon reasonable suspicion in <u>United States v. Makeeff</u>, 820 F.3d 995 (2016).  Mr. Makeef was on federal supervised release when he was subjected to a search by his probation officer. In contrast to probation, the court described supervised release as being imposed in

10

"there were or might be guns in Griffin's apartment." Id. Mr. Griffin challenged the search, in part because he did not believe the information provided sufficed to meet the standard of reasonable suspicion to believe he had violated the terms of his probation. Id. at 875-76.

The Court acknowledged that the information provided to the probation officer (an unauthenticated tip from a police officer, bearing no indication of whether or not it was based upon firsthand knowledge or whether the source was reliable, but merely that Mr. Griffin "might" have guns in his home) would most certainly *not* rise to the level of probable cause. Id. at 878. But, the court stressed, the supervisory arrangement between a probationer and his probation officer was not meant to be held to such a high standard. Id.

Instead, the Court explained, a probation officer should be free to consider things that a police officer or detached, neutral magistrate ordinarily cannot consider when deciding whether reasonable suspicion to search exists. This is so because the nature of the relationship between a probationer and his supervisor involves "a situation in which there is an ongoing supervisory relationship—and one that is not, or at least not entirely, adversarial—between

---

addition to, not in lieu of incarceration. Id. at 1001.  "Supervised release, parole, and probation lie on a continuum.  The most severe is supervised release, which is followed, in descending order, by parole, then probation. Thus, as the district court noted, the current case involves the most circumscribed expectation of privacy." Id. (citations omitted, internal punctuation altered).  See also Samson v. California, 547 U.S. 843 (2006) (discussed infra (allowing search of parolee even without reasonable suspicion); United States v. Hamilton, 591 F.3d 1017 (8th Cir. 2010) (applying the Griffin reasonable suspicion standard to a parole search).

the object of the search and the decisionmaker." Id. at 879.  The Court

explained:

> In such circumstances *it is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts.  In some cases—especially those involving drugs or illegal weapons—the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society.*  The agency, moreover, must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in light of its knowledge of his life, character, and circumstances.

> To allow play for such factors, we think *it reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge,* to support a probationer search.  *The same conclusion is suggested by the fact that police may be unwilling to disclose their confidential sources to probation personnel.*  For the same reason, and also because it is the very assumption of the institution of probation that the probationer is in need of rehabilitation and is more likely than the ordinary citizen to violate the law, *we think it enough if the information provided indicates, as it did here, only the likelihood* ("had or might have guns") *of facts justifying the search.*

> The search of Griffin's residence was "reasonable" within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers.

Id. at 879-80 (emphasis added).  In Griffin, the tip provided to the probation

officer was merely that the probationer "might" have guns in his home, and

there was no indication that the tip was based upon the personal knowledge of

the police officer or even a reliable confidential source.  Id.  at 878.  The

Supreme Court recognized that the police, though willing to assist probation

officers, for obvious reasons would often be unwilling to share the identities of

their confidential informants.  Id. at 879-80.   The Griffin Court laid the groundwork, therefore, for the following cases which instruct that because a probationer or parolee has an extremely circumscribed expectation of privacy, the probation or parole officer's determination to conduct a search should be given a wide berth.

The Supreme Court again examined a probation search in United States v. Knights, 534 U.S. 112 (2001).  There, the probationer was subject to terms of probation which required him to submit to a warrantless search by any probation officer or law enforcement officer upon a determination of reasonable cause.  Id. at 114.  When Mr. Knights became a suspect in an arson case, a police detective who was aware of the terms of Mr. Knights' probation agreement searched Knights' apartment without a warrant.  Id. at 115.  The search yielded incriminating evidence.  Id. at 116.  Mr. Knights challenged the search relying on Griffin, arguing it was invalid because it was made for investigatory, not probationary purposes.  Id.  The Supreme Court, however, explained that it did not intend Griffin to so limit the warrantless searches of probationers. Id. at 118-19.

The Court began its analysis where Fourth Amendment analyses often begin—by explaining that "the touchstone of the Fourth Amendment is reasonableness." Id. at 118.  In the context of a search, reasonableness is determined by examining on one hand, the degree of intrusion upon a person's privacy and on the other, the degree to which the search is necessary to promote a legitimate government interest.  Id.  But, the Court explained, in

13

Mr. Knight's case, his status as a probationer "inform[ed] both sides of the balance." Id. at 119. The Court reiterated that no more than reasonable suspicion is required to search a probationer's home. Id. at 120. "When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." Id. at 121. Finally, the Court concluded that because its holding rested on "ordinary Fourth Amendment analysis" there was no basis for examining the "official purpose" for the search. Id. at 122. In other words, it did not matter that the officer who searched Mr. Knights' home did so for investigatory rather than probationary purposes. This was so because, with limited exceptions, the Court had been unwilling to entertain Fourth Amendment challenges based on the actual motivations of the individual officers. Id. Because the search of Mr. Knights' home was based upon reasonable suspicion and was authorized by the terms of his probation agreement, it was reasonable within the meaning of the Fourth Amendment. Id.

The Supreme Court examined the constitutionality of warrantless parole searches in Samson v. California, 547 U.S. 843 (2006). A California statute required every prisoner eligible for parole to sign an agreement which allowed for searches with or without a warrant and with or without *any suspicion at all*. Id. at 846. Mr. Samson was on state parole when a police officer stopped him and searched him, based solely on his status as a parolee. Id. at 847.

14

At the time of this search, Mr. Samson was simply walking down the street doing nothing suspicious.  Id.  There was no indication the police officer had any reason to believe Mr. Samson had violated his parole or committed any criminal act since his release from prison.  Id. at 846.  The officer found methamphetamine on Mr. Samson's person, which resulted in new criminal charges against Mr. Samson.  Id.  at 847.

Mr. Samson challenged the search, arguing the statute which required parolees to submit to not only warrantless but *suspicionless* searches violated the Fourth Amendment.  Id.  The Court returned to the familiar inquiry, examining whether the search was reasonable considering the totality of the circumstances.  Id. at 848.  To make this determination, the Court weighed the intrusion on Mr. Samson's privacy against the degree to which the search was needed to promote a legitimate governmental interest.  Id.

To make the reasonableness determination, the Court examined Mr. Samson's status as a parolee.  Id.  The court reiterated that a parolee occupies a place on the "continuum" of non-free people beginning with solitary confinement in a maximum security institution and ending with a person sentenced to a few hours of mandatory community service.  Id.  at 848-50.

Parole, the Court observed, is more akin to imprisonment than probation because in essence parole is a release from prison before the sentence is completed on the condition that the prisoner abide by certain rules during the balance of the sentence.  Id. at 850.  In California, those parole conditions could include much more than refraining from committing further crimes.  For

15

example, common conditions imposed were: mandatory drug tests, restrictions on associating with felons or gang members, mandatory meetings with parole officers, informing the parole officer of any change in employment status, requesting permission to travel more than 50 miles from home, refraining from the possession of guns and other specified weapons, abstinence from alcohol, and obtaining permission for the parolee's place of residence.  Id. at 851-52.

The Court observed that the "extent and reach of these conditions clearly demonstrate that parolees  . . . have severely diminished expectations of privacy by virtue of their status alone."  Id. at 852.  And, as clearly expressed to Mr. Samson, he was required to agree to a suspicionless search at any time. Id.  As such, the Court determined Mr. Samson did not have an expectation of privacy that society would recognize as legitimate.  Id.

The State's interests in supervising parolees, on the other hand, were "overwhelming."  Id. at 853.  This was so because "parolees are more likely to commit future criminal offenses."  Id. (citing Pennsylvania Bd. Of Probation and Parole v. Scott, 524 U.S. 357, 365 (1998)).  The Court acknowledged that California's ability to conduct suspicionless searches of parolees "serves its interest in reducing recidivism, in a manner that aids, rather than hinders, the reintegration of parolees into productive society."  Id. at 854.  A requirement for individualized suspicion would undermine the State's ability to effectively supervise parolees and protect the public from criminal acts by reoffenders, because it would give parolees "greater opportunity to anticipate searches and conceal criminality."  Id.  The Court noted that unlike California, most other

states and the federal government require at least some level of individualized suspicion in order to conduct a parole search.  Id. at 855.  But that other states and the federal government required reasonable suspicion was of "little relevance" to the Court's determination that California's system met its needs and was reasonable (i.e. constitutional) "taking into account a parolee's substantially diminished expectation of privacy."  Id. at 855.  The Court concluded the Fourth Amendment does not prohibit suspicionless searches of parolees.  Id. at 857.

The Eighth Circuit analyzed a probation search in United States v. Brown, 346 F.3d 808 (8th Cir. 2003).  Mr. Brown's probation officer conducted a probation search based in part upon informants' tips relayed to her by the local police department's drug task force.  Id. at 810.  The probation officer also believed Mr. Brown had violated the terms of his probation by failing to keep her informed of his current address.  Id.  Mr. Brown argued his probation officer did not have reasonable suspicion to search.  Id. at 812-13.  The Eighth Circuit disagreed, explaining

> A drug task force agent called [the probation officer] and told her the task force suspected Brown's involvement in illegal activity. The agent also told her the task force had obtained a warrant to search Brown's business.  Prior to receiving this call, [the probation officer] had been unable to confirm Brown's address. So, at a time [the probation officer] was unable to verify her probationer's address, a task force agent told her that the force not only suspected Brown's drug involvement, but also had produced enough evidence to secure a warrant to search Brown's business. [The probation officer's] suspicion was reasonable.

Id.[6]  Notably, the probation officer in Brown was accompanied by police officers during the search even though the probation agreement did not explicitly authorize searches by police officers.  Id. at 812.  The court did not find the presence of the police officers altered the analysis.  Id.  The court explained that probation offices "are neither designed nor staffed to conduct these types of searches alone" and that "assistance of other law enforcement officers for protection and for taking possession of contraband is appropriate and recommended . . . Probation officers often must bring law enforcement along to ensure the probation officers' safety."  Id. (citation omitted, internal punctuation altered).

In United States v. Hamilton, 591 F.3d 1017 (8th Cir. 2010), the Eighth Circuit examined the constitutionality of a parole search.  Mr. Hamilton paroled from state prison in Arkansas after a conviction for sexual abuse of a minor and possession of child pornography.  Id. at 1019-20.  The conditions of his parole allowed him to have a computer and access the internet, but required him to abstain from the use of alcohol and to submit to search and seizure upon reasonable suspicion.  Id. at 1021-22.[7]

---

[6] The task force admitted that though they suspected he was involved in drug activity and had procured a warrant to search Mr. Brown's business, at the time they did not have probable cause to search Mr. Brown's home.  Id. at 810.

[7] The court noted the parole agreement Mr. Hamilton signed did not require reasonable suspicion but the Arkansas parole board policies did require reasonable suspicion.  Id. at 1021-22.  The court noted if Arkansas allowed suspicionless searches, the recent Supreme Court case (Samson) would be the end of the inquiry because it held suspicionless parole searches did not violate the Fourth Amendment.  Id. at 1021.  But, because the parties agreed

In Mr. Hamilton's case, two parole officers made an unannounced visit to his home at the request of his supervising parole officer as "part of a larger spot check on area sex offenders." Id. at 1020.  The two parole officers knocked on Mr. Hamilton's door and identified themselves (Mr. Hamilton lived in a very small camper-trailer), and Mr. Hamilton answered by saying "let me get dressed." Id.  The officers heard shuffling noises and commotion for about five minutes before Mr. Hamilton finally opened the door, wearing only sweat pants. Id.  The officers asked Mr. Hamilton if he had a problem with them conducting a search of his home, to which Mr. Hamilton replied "no, everything is fine." Id. The parole officers saw empty beer cans littered all over the trailer, in clear violation of the condition that Mr. Hamilton not consume alcohol.  The officers then searched for more violations, and found a case of beer in the refrigerator. Id.

One of the officers told Mr. Hamilton he was going to scan his laptop computer for images.  When the officer opened the laptop, the media window bar displayed a title indicative of child pornography. Id.  The file was not located in the computer, indicating the file had been uploaded from an external device.  The officer confronted Mr. Hamilton, who admitted possessing compact discs which he had hidden under a couch cushion when the officers knocked on the door. Id.  The parole officers contacted law enforcement, who arrested Mr. Hamilton, applied for a search warrant, and eventually found much more child pornography in his trailer home. Id.

reasonable suspicion was necessary, the court decided the case should turn on whether the parole officer had reasonable suspicion to search. Id. at 1022.

Mr. Hamilton moved to suppress the evidence.  Id. at 1021.  He asserted that *at the time the officers decided to visit his home*, they did not have reasonable suspicion.   Mr. Hamilton asserted that at the moment the decision was made to send the two parole officers to his home, the only information they knew was that he owned a computer and had access to the internet—neither of which was prohibited by the terms of his parole.  Id. at 1022.  The Eighth Circuit rejected Mr. Hamilton's argument.

> [T]he Fourth Amendment applies to the act of searching, not the initial decision to search, and it applies an objective standard based on the information known by the searching officers at the time of the search.  See Terry v. Ohio, 392 U.S. 1, 21-22 (1968). ("And in making [the Fourth Amendment] assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer *at the moment of the seizure or the search* 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"  (emphasis added)); see also  United States v. Atlas, 94 F.3d 447, 450 (8th Cir. 1996) ("In analyzing whether a reasonable suspicion existed, the totality of the circumstances—the whole picture—must be taken into account.  We must consider the information available to the police at the time of the search."  (internal citations and marks omitted). We reject Hamilton's argument that we may look only at the facts known to Officer Harvey when she decided to send Officers Parker and Tucker to make a home visit to a parolee and we proceed to determine whether the parole officers violated Hamilton's rights under the Fourth Amendment based on the officers' knowledge at the scene of the search.

Id. at 1022-23.  The court concluded that because the initial "knock and talk" by the parole officers was a consensual encounter, it did not violate the Fourth Amendment.  Id. at 1023.   But once the officers heard the commotion inside while Mr. Hamilton was supposedly getting dressed but then answered the door after five minutes wearing only sweat pants, the officers rightly suspected he had spent the time while they were waiting outside trying to hide something

rather than getting dressed.  Id. at 1023.  Because there were beer cans strewn around the trailer, he clearly had not spent the time hiding the evidence that he had been drinking (one of the prohibitions in his parole agreement).  Id.  The officers knew at first glance Mr. Hamilton had violated his parole by drinking, and his behavior caused them to suspect he had violated *other* terms of his parole.  Id.  "Having lawfully entered Hamilton's trailer and observed in plain view a clear indication that Hamilton had violated his parole conditions, the circumstances known by the officers justified their continued search."  Id. at 1023.  At the time they searched, therefore, they had reasonable suspicion to do so.  Id. at 1023-24.

Finally, the Eighth Circuit very recently discussed the expectation of privacy held by a probationer or parolee in United States v. Makeeff, 820 F.3d 995 (8th Cir. 2016).  Mr. Makeeff was a federal inmate who was serving the supervised release portion of his sentence.  Id. at 997.  The terms of his supervised release required Mr. Makeeff to refrain from violating any local, state or federal laws and from possessing or consuming controlled substances. Mr. Makeeff was also required to answer all inquiries by his probation officer as well as follow her instructions and allow her to visit his home at any time.  Id. at 997-98.  Additionally, Mr. Makeeff was not allowed to possess or view any form of pornography nor could he possess or have access to a computer without first gaining permission from his probation officer.  Id.

After he admitted several violations of the terms of his supervised release, his release terms were modified to include a provision that Mr. Makeeff

21

would submit to a search of his home upon reasonable suspicion to believe he had violated the terms of his release.  Id. at 998.

Thereafter, Mr. Makeeff's probation officer received a tip that Mr. Makeeff had been bragging about using a computer and viewing child pornography, both of which were violations of his terms of supervised release. Id.  As a result, his probation officer made an unannounced visit to his home. Id.  Upon arrival, the officer observed a USB drive sitting on a table in plain view in the residence.  Id.  Both Mr. Makeeff and his wife denied ownership of the USB drive, but both gave consent to search it.  Id.  Though Mr. Makeeff denied ownership of the USB drive, he admitted he had used the computer, used the internet, viewed adult pornography, and he warned the probation officer that the USB drive contained a "virus" which was responsible for placing images of child pornography onto the drive.  Id.   The USB drive did in fact contain child pornography.  A forensic analysis determined a virus was not responsible for placing the child pornography on the drive.  Id. at 999.

Mr. Makeeff moved to suppress the evidence, asserting the search violated his Fourth Amendment rights.  Id.  The Eighth Circuit examined the circumstances of the search to determine whether it was reasonable under the Fourth Amendment.  Id. at 1000.  To do so, the court reviewed Griffin and Knights.  Id. at 1000-01.  The court gleaned two conclusions from Griffin and Knights:

> First, probationary searches-- whether for law enforcement or
> probationary purposes—are acceptable under Knights if based
> upon reasonable suspicion (or potentially a lesser standard).
> Second, under the special needs doctrine articulated in Griffin,

searches for probationary purposes will be upheld if authorized by
a law that is in itself reasonable.

Id. at 1001.  (citations omitted, punctuation altered).

The court concluded the probation officer had reasonable suspicion to
search and seize the USB drive.  Id.  It cited seven facts which, in totality,
amounted to reasonable suspicion that Mr. Makeeff had either committed a
crime or a violation of his terms of release:  (1) Mr. Makeeff had a prior
conviction for possession of child pornography; (2) he was prohibited from
viewing or possessing any pornography; (3) he was prohibited from accessing or
possessing a computer without permission from his probation officer; (4) he
had his supervised release conditions modified after he viewed pornography,
which he claimed was adult pornography; (5) the probation office received a tip
that Mr. Makeeff bragged about using a computer and possessing child
pornography; (6) once inside the Makeeff residence, the probation officer
observed a USB drive, a device that is accessible via computer—which
Mr. Makeeff was prohibited from using without prior permission from his
probation officer, and to which the tip related; and (7) despite discovery of the
USB drive in plain sight, both Mr. Makeeff and his wife denied they owned it.
Id. at 1001.

But the court went even further, noting that the existence of the USB
drive in Mr. Makeeff's home alone was sufficient to trigger reasonable
suspicion.  Id.  The observance of the USB drive, combined with his prior
conviction, his prior supervised release violation, and the tip received by the
probation officer also *collectively* created reasonable suspicion that Mr. Makeeff

23

had again violated the terms of his supervised release by viewing pornography. Id. at 1002.  The probation officer therefore had both the requisite reasonable suspicion to *search* and the search condition necessary to *seize* the USB drive. Id.

The above cases demonstrate that the reasonable suspicion required for a probation or parole search is based upon the totality of the circumstances pertaining to the defendant and known to the probation or parole officer. Griffin, 483 U.S. at 879-80; Knights, 534 U.S. at 122; Samson, 547 U.S. at 852; Hamilton, 591 F.3d at 1022.  "And when a [defendant] consents to a search condition, his already-reduced reasonable expectation of privacy diminishes significantly."  Brown, 346 F.3d at 811 (citing Knights, 534 U.S. at 120).

Reasonable suspicion for a probation or parole search, therefore, may be based at least in part, if not completely, upon an unauthenticated tip from the police even though there is no indication of whether it is based upon personal knowledge or regarding the tip source's reliability. Griffin, 483 U.S. at 878.[8] Likewise, the totality of circumstances leading to reasonable suspicion includes *all* of the circumstances about the defendant known to the probation or parole officer, including the defendant's prior convictions and prior violations of

---

[8] See also, United States v. Carter, 511 F.3d 1264, 1269 (2008) (probation searches generally upheld under the reasonable suspicion standard when the probation officer's suspicion is based only on a tip by an anonymous informer, the police, or other sources because when it comes to probation searches, to insist on the same degree of demonstrable reliability of particular items, supporting data, and upon the same degree of certainty of a violation as is required in other contexts would undermine the probation relationship (citing Griffin, 483 U.S. at 879)).

probation or parole—even though the punishment for those indiscretions has already been served.  Makeeff, 820 F.3d at 1001.  And, reasonable suspicion for a probation or parole search may include evidence the probation or parole officer discovers  upon arriving at the defendant's home for an unannounced visit pursuant to the terms of the defendant's probation/parole Agreement. Hamilton, 591 F.3d at 1022.

### 2.   Ms. Buiter Had Reasonable Suspicion To Search[9]

Mr. Taylor asserts that because he does not know the identity or reliability of the confidential informant referred to in the email received by Ms. Buiter from Detective Skidmore or the date of the more recent Crime Stoppers tip which was referenced in Ms. Buiter's summary letter (Exhibit B), there was not reasonable suspicion for the parole search.  Mr. Taylor further asserts that because there was no reasonable suspicion, the fruits of the parole search should be suppressed.   The date of the Crime Stoppers tip is not relevant because Ms. Buiter testified she did not rely on the Crime Stoppers information.

The constitutionality of searches based on information provided by informants usually depends upon the reliability of the informant, which in turn depends upon whether the informant has a track record of supplying reliable

---

[9] Though this court has been able to find no South Dakota statue or regulation which requires reasonable suspicion to conduct a parole search (see SDCL § 24-15-11 and A.R.S.D. § 17:60:02:09), and the Fourth Amendment does not require reasonable suspicion pursuant to Samson, the "Parole Standard Supervision Agreement" which Mr. Taylor signed requires reasonable suspicion and the parties agree Ms. Buiter needed reasonable suspicion.  The court therefore proceeds on that basis.  Hamilton, 591 F.3d at 1022.

information, whether the tip is based on personal observation, and whether the information supplied is corroborated by independent evidence.  United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993) (citing Illinois v. Gates, 462 U.S. 213, 233-34 (1983); Draper v. United States, 358 U.S. 307, 313 (1959)).  As explained above, however, Griffin instructs that in the case of a probation or parole search, the personal knowledge/proof of reliability requirement for a police tip may be relaxed when the totality of the circumstances indicates the probation/parole officer's knowledge of the defendant includes other sufficient information acquired through the ongoing supervisory probation or parole relationship.  Griffin, 483 U.S. at 878-79.

Reasonable suspicion requires an officer conducting a search or seizure to "be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' " United States v. Sokolow, 490 U.S. 1, 7 (1989).  The Fourth Amendment requires "some minimal level of objective justification" for the search.  INS v. Delgado, 466 U.S. 210, 217 (1984).  "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."  Alabama v. White, 496 U.S. 325, 330 (1990).  "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability.  Both factors–quantity and

26

quality–are considered in the 'totality of the circumstances–the whole picture,' that must be taken into account when evaluating whether there is reasonable suspicion." Id. at 330 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). As the Griffin Court explained, whether reasonable suspicion exists is for a parole search is informed by a "whole picture" which is much more expansive than the elements usually considered by a police officer or detached magistrate. Griffin, 483 U.S. at 879. Instead, the parole officer proceeds based upon her "entire experience with the [parolee], and [assesses] probabilities in light of . . . knowledge of his life, character and circumstances." Id.

With that admonition in mind, the facts known to Ms. Buiter when she decided to conduct the parole search of Mr. Taylor's home were these: (1) During his initial parole meeting at which his mother was present, Mr. Taylor expressed his earlier tendencies for aggression/violence but indicated he had "outgrown" such tendencies; (2) Mr. Taylor's mother was present when Ms. Buiter explained the terms and conditions of his parole during the initial parole meeting. Ms. Buiter initially approved Mr. Taylor's plan to reside in a home with his mother and step-father upon his release to parole; (3) only a few weeks into his parole supervision, Mr. Taylor got into a bar fight which resulted in his nose being broken; (4) Mr. Taylor's mother and step-father were present in the bar when Mr. Taylor got into the bar fight; (5) Mr. Taylor's mere presence in a bar was a violation of the terms of his parole agreement; (6) that Mr. Taylor got into a bar fight indicated to Ms. Buiter that Mr. Taylor had not been truthful about leaving his aggressive/violent

27

tendencies behind him; (7) the sanction Ms. Buiter imposed for Mr. Taylor's first parole violation—the bar fight—was to place him on the Community Transition Program (CTP) for a period of approximately one month; (8) as a condition of his transition out of the CTP program back into his home, Ms. Buiter explained to Mr. Taylor that his mother and step-father could not also live in the home with him because of their presence at the bar when Mr. Taylor was at the bar and got into the bar fight, both of which were violations of Mr. Taylor's parole agreement; (9) Mr. Taylor agreed that his mother and step-father would move out of the home before he was released from CTP and that only he and his girlfriend would be living in the home, which he would rent; (10) on January 30, 2016, six months later, Ms. Buiter received an email from Sioux Falls Police Detective Skidmore explaining he had information from a confidential informant about Mr. Taylor.  The information from the confidential informant indicated Mr. Taylor had several guns in his home, was selling drugs, identified the type of car Mr. Taylor drove, states Mr. Taylor possibly had a gun in his car, and indicated the confidential informant had been in a dispute with Mr. Taylor and was afraid Mr. Taylor would retaliate against him/her; (10) though Ms. Buiter did not know whether the tip received from Detective Skidmore was based on personal knowledge nor did she know anything about the confidential informant's reliability, Ms. Buiter trusted the information she received from Detective Skidmore; (11) The confidential informant's mention of the dispute and fear of retaliation, combined with her knowledge of the earlier bar fight confirmed Ms. Buiter's

28

belief that Mr. Taylor violated the terms of his agreement by failing to be truthful with her and by engaging in assaultive, abusive or violent behavior or threats of violence; and (12) upon her arrival at Mr. Taylor's home and before she began to search, Ms. Buiter learned Mr. Taylor and not been truthful with her about his living arrangements upon release from CTP.  Specifically Mr. Taylor did not comply with Ms. Buiter's instructions that he would not be allowed to reside with his mother and step-father upon his release from CTP. Contrary to this instruction, Mr. Taylor's mother and step-father were living  in Mr. Taylor's home with him, in direct violation of Ms. Buiter's instructions.[10]

Pursuant to <u>Griffin</u> it is arguable that Ms. Buiter had reasonable suspicion to conduct the parole search based upon Detective Skidmore's tip alone.  <u>Griffin,</u>  483 U.S. at 880.  Given all of the other knowledge Ms. Buiter had gleaned about Mr. Taylor's "life, character and circumstances" (<u>Griffin</u>, at 879) as outlined above, the totality of the circumstances overwhelmingly supports a finding that Ms. Buiter had reasonable suspicion to conduct the parole search which occurred on February 5, 2016.  <u>Griffin</u>, 483 U.S. at 879-80; <u>Knights</u>, 534 U.S. at 122; <u>Brown</u>, 346 F.3d at 812-13; <u>Hamilton</u>, 591 F.3d at 1022-23; <u>Makeeff</u>, 820 F.3d at 1001.  As such, Mr. Taylor's motion to suppress evidence should be denied.

---

[10] The court notes that during the evidentiary hearing there was some disagreement about whether Ms. Buiter learned this information before or after she began searching Mr. Taylor's home.  The court finds Ms. Buiter learned this information before she began the search.  If a reviewing court disagrees with this finding, this court specifically finds that even if Ms. Buiter did not learn Mr. Taylor's mother and step-father lived with him until after she began her search, Ms. Buiter nevertheless had enough information to form reasonable suspicion for the parole search before the search began.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends that defendant Dustyn James Taylor's motion to suppress [Docket No. 40] be denied.

## NOTICE TO THE PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require de novo review by the District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED December 29, 2016.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge

30